**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Andrew H. S., <br><br> Plaintiff, <br><br> v. <br><br> Kilolo Kijakazi, Commissioner of Social Security, <br><br> Defendant. | Case No. 20-cv-1553 (SRN/HB) <br><br><br> **REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Andrew H. S. seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI"). This matter is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 17, 22], which were referred to the undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and that the Commissioner's motion be granted.

I.   **Background**

A.   **Procedural History**

Plaintiff filed an application for SSI on July 27, 2017, alleging a disability onset

date of June 1, 2007.  (*See* R. 126-34.)[1]  The application was denied initially and on

reconsideration, and Plaintiff timely requested a hearing before an ALJ.  (R. 47, 62, 94-

96.)  The ALJ convened a hearing in-person at Duluth, Minnesota, at which Plaintiff

testified and vocational expert Warren Haagenson testified by phone.  (R. 10, 25-46.)

On September 26, 2019, the ALJ issued a written decision denying Plaintiff's SSI

application.  (R. 7-24.)  The relevant findings and conclusions are described below.  The

Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the

final decision of the Commissioner.  (R. 1-6.)  Plaintiff then filed this action for judicial

review.

### B.    Relevant Medical Records and Other Evidence

The Court will recount the facts of record only to the extent they are helpful for

context or necessary for resolution of the specific issues presented in the parties' motions.

Plaintiff alleged a mental impairment, and the Court will focus on evidence relating to

that impairment.

At the age of thirty-six, Plaintiff visited Essentia Health's Lakewalk Clinic on July

5, 2017.  (R. 260.)  He stated he had been released from federal prison ten months earlier

after ten years of incarceration,[2] currently lived with his mother who cared for him, and

now wanted to establish a primary care physician to obtain a referral to behavioral health.

(R. 260-61.)  He reported to Dr. Paul Jones that he was diagnosed with a panic disorder at

---

[1] The administrative record (R.) is located on the docket at ECF No. 16.
[2] The consultative psychologist stated Plaintiff had been incarcerated for a total of nearly twenty years "including juvenile and residential settings, foster homes, etc." (R. 294.)

the age of fourteen and post-traumatic stress disorder ("PTSD") at the age of nineteen after witnessing a violent car accident and a stabbing. (R. 260.) He witnessed a second stabbing in 2014, while he was in prison. (*Id.*) As a result, he suffered nightmares and headaches, migraines, and panic attacks, which worsened with crowds and loud noises. (R. 260-61.) He also reported hallucinations of spiders. (R. 261.) He remembered being given Zoloft,[3] imipramine,[4] Risperdal,[5] Prozac,[6] BuSpar,[7] gabapentin,[8] and Seroquel[9] while incarcerated. (*Id.*) Dr. Jones noted his complex psychiatric and social history and concluded anxiety and PTSD likely caused his symptoms, but he could not rule out depression, bipolar disorder, or other psychotic disorders. (R. 262-63.)

---

[3] Zoloft is a brand name for sertraline, which is used to treat depression, panic attacks, obsessive-compulsive disorder, PTSD, and social anxiety disorder. Sertraline, MedlinePlus, https://medlineplus.gov/druginfo/meds/a697048.html (last revised Apr. 15, 2020).

[4] Imipramine is used to treat depression and sometimes panic disorders. Imipramine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682389.html (last revised Sept. 15, 2018).

[5] Risperdal is the brand name for risperidone, which is used to treat symptoms of schizophrenia and episodes of mania and depression in individuals with bipolar disorder. Risperidone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694015.html (last revised Nov. 15, 2017).

[6] Prozac is the brand name for fluoxetine, which is used to treat depression, obsessive-compulsive disorder, and panic attacks. Fluoxetine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a689006.html (last revised Mar. 15, 2020).

[7] BuSpar is the brand name for buspirone, which is used to treat anxiety disorders. Buspirone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a688005.html (last revised Apr. 15, 2019).

[8] Gabapentin is used to control seizures. Gabapentin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a694007.html (last revised May 15, 2020).

[9] Seroquel is the brand name for quetiapine, which is used to treat symptoms of schizophrenia, mania, and depression in individuals with bipolar disorder. Quetiapine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a698019.html (last revised June 15, 2020).

Plaintiff attempted to self-medicate using alcohol, marijuana, and heroin.  (R.

278.)  He presented to the Emergency Department of St. Luke's Hospital in August 2017

for help with opiate withdrawal.  (R.  270).  In the assessment conducted on August 11,

2017, he reported that he was unemployed and did not have a structured daily living

regimen.  (R. 289.)  He had limited ability to cope with the anxiety and the cravings, and

he was willing to do whatever it takes to become sober.  (R. 285-87.)  However, he

preferred one-on-one sessions because of his social anxiety.  (R. 287.)  Plaintiff was

prescribed medication to assist with the effects of opiate withdrawal.  (R. 271.)

On September 6, 2017, Plaintiff met with the Social Security Administration's

("SSA") consultative psychologist Marcus Desmonde, Psy.D.  (R. 294-96.)  Dr.

Desmonde reported Plaintiff was applying for social security disability benefits "because

he's been out of prison for a year and is not on probation or parole and has not been able

to obtain or maintain any gainful employment."  (R. 294.)  Dr. Desmonde reviewed Dr.

Jones's notes.  (R. 294.)  He noted that Plaintiff was taking hydroxyzine[10] and

Clonodine[11] as prescribed.  (*Id*.)  Plaintiff told Dr. Desmonde his barriers to employment

included anxiety and "panic that invariably occur once he is on a job site."  (*Id.*)  Plaintiff

stated "I have a hard time dealing with crowds of people or people in general and just

walk off a job."  (*Id.*)  He further told Dr. Desmonde that in the past he had supported

---

[10] Hydroxyzine is used alone or with other medications in adults and children to relieve
anxiety and tension.  Hydroxyzine, MedlinePlus,
https://medlineplus.gov/druginfo/meds/a682866.html (last revised Feb. 15, 2017).
[11] Clonidine is used for opiate withdrawal.  Clonidine, MedlinePlus,
https://medlineplus.gov/druginfo/meds/a682243.html (last revised May 15, 2017).

himself by dealing drugs but that "I don't want to go back to prison or go to jail so I've been staying with family and friends since I got out and staying away from people that I could really get in trouble with and locked up again." (*Id.*)  He admitted smoking and drinking alcohol but denied use of nonprescription drugs at that time. (*Id.*)  He stayed away from church or any large gatherings due to his anxiety.  (*Id.*)  Dr. Desmonde observed Plaintiff "tended to ramble from topic to topic and at times required redirection to respond to his initial question." (*Id.*)  Plaintiff denied hallucinations and obsessive thoughts. (R. 294-95.)  He admitted to having trust problems because his old friends were involved in the drug trade.  (R. 295.)  He described having difficulties getting to sleep at night, moments of "extreme irritability with angry outbursts and 'throwing things,'" but denied being violent towards people. (*Id.*)

Dr. Desmonde asked Plaintiff to perform a series of counting sequences and other mental games to assess his impairment.  Plaintiff's concentration showed the ability to recall six digits forward and three digits in reverse.  (*Id.*)  Plaintiff was able to compute serial seven additions to 121 and subtractions more slowly to eighty-six.  (*Id.*)  Evaluation of his short-term memory showed the ability to recall two of three unrelated objects immediately, one of three after five minutes, and one of three at the end of the interview. (*Id.*)  Longer term recall showed the ability to sequence events over the last twenty years without confusion. (*Id.*) Dr. Desmonde concluded Plaintiff had low-average concentration, unimpaired judgment and insight, antisocial features, and an estimated IQ of around 85. (*Id.*)  He noted Plaintiff "has been successful in the last year by staying out of trouble.  He shows good insight into problem areas for him and is taking medicine for

his anxiety." (*Id.*)  Dr. Desmonde opined Plaintiff would be capable of managing his own financial affairs if benefits are awarded.  (*Id.*)  Regarding Plaintiff's migraines, Dr. Desmonde "would defer to the medical examiners in terms of his overall status."  (*Id.*) Dr. Desmonde determined Plaintiff had a mild limitation in his ability to understand, remember and apply information in an employment situation; moderate limitations in his ability to interact with co-workers, supervisors, and the general public; moderate limitations in his ability to concentrate, persist, and maintain pace in an employment situation; and mild limitations in his ability to manage his activities of daily living.  (R. 295-96.)

Plaintiff went to the emergency room on October 16, 2017, after his anxiety worsened and he suffered a panic attack.  (R. 298-309.)  He reported headaches, anxiety, and loss of peripheral vision worsened by loud noises, bright lights, and leaving his house. (R. 307.)  Plaintiff was prescribed Lorazepam for the anxiety and referred to St. Luke's Mental Health Services.  (*Id.*)  Dr. David Baldes conducted the initial psychiatric evaluation (R. 328-31) and treated Plaintiff until at least March of 2019 (R. 364).  During these examinations, Dr. Baldes observed Plaintiff was pleasant and cooperative and that Plaintiff was much more articulate than his formal education (GED) would suggest.  (*See, e.g.*, R. 329-30, 388, 391.)  Plaintiff had recurrent anxiety thoughts and compulsion to count to soothe himself. (*See, e.g.*, R. 330, 388, 391). Nevertheless, Plaintiff's concentration was adequate, memory was intact, judgment was good, and his fund of knowledge was well above his educational level.  (*See, e.g.*, R. 330, 388, 391.)

In the report of his initial evaluation, Dr. Baldes reviewed Plaintiff's history of

panic attacks and obsessive-compulsive disorder, which Plaintiff then reported as starting

at the age of 8.  (R. 328.)  Dr. Baldes states that Plaintiff reported that he started getting

treatment at age 14 and "was in and out of juvenile homes and treatment centers for

children throughout his adolescence," but was "sensitive to meds"[12] and had "stopped

pursuing medication treatment in 1996." (*Id.*)[13]  Plaintiff also recounted witnessing the

traumatic events while incarcerated and severe periods of autonomic arousal that wake

him from sleep in a full panic.  (R. 328-29.)  During a panic attack, Plaintiff experienced

a racing heart, feelings of terror and loss of control, shortness of breath, tightness of his

chest, shaking, sweating, and behavioral volatility.  (R. 329.)  Although Plaintiff denied

depression, Dr. Baldes's evaluation suggested he was severely depressed. (R. 328-29.)

Dr. Baldes's assessed Plaintiff as having chronic and severe PTSD that "clearly

exceed[ed] his ability to cope and manage the symptoms using cognitive techniques or

relaxation techniques."  (R. 330.)

Although Dr. Baldes considered serotonin reuptake inhibitors ("SRIs") to treat the

PTSD-induced nightmares, he decided to prescribe an autonomic modulating agent,

---

[12] There are several references in the records to Plaintiff's self-reported sensitivity to past
medications, but the only significant side-effect identified was severe tachycardia when
he was given imipramine while incarcerated, as a result of which that medication was
stopped. (R. 329.)  He told Dr. Baldes and testified at the hearing that the hydroxyzine he
was prescribed made him feel "dried out" and somewhat lightheaded (R. 33, 329), and
testified that if he takes the diazepam in an emergency, he "can't really do much at all."
(R. 33.)

[13] Later in his evaluation report, Dr. Baldes states flatly that Plaintiff had "taken no meds
since 1996." (R. 329.)  These statements are difficult to reconcile with Dr. Baldes's note
in the same report that Plaintiff had been "treated in prison with imipramine." (R. 329.)
Unlike Dr. Jones, however, Dr. Baldes makes no mention of any other medications
Plaintiff may have taken while in prison.

prazosin, due to Plaintiff's poor reaction to medication in the past. (R. 330.) For the same reason, he did not prescribe an SRI to treat Plaintiff's obsessive thoughts. (R. 330.) He prescribed diazepam for use during panic attacks only. (*Id.*) Dr. Baldes concluded that Plaintiff was "in terms of his functional capacity, . . . severely limited due to his anxiety disorders. He appears bright and self-educated but has severe symptoms limiting his ability to leave the home and engage in formal education, job seeking activity, or work. . . . His ability to follow a work schedule, follow instructions, and interact with the public is all severely impaired due to his severe anxiety." (R. 330-31.)

In a follow-up appointment with Dr. Baldes on May 9, 2018, Plaintiff reported the prazosin was "quite helpful" for his nightmares and that the diazepam was "helpful in moments of severe panic emergency where he otherwise would have to go to the ER." (R. 337.) Plaintiff had taken 45 doses of diazepam since prescribed. (*Id.*) Dr. Baldes consulted with Plaintiff regarding natural remedies, how to cope with recent stressors, and encouraged Plaintiff to pursue his writing project on the "secret history of Duluth." (R. 338.) He also prescribed a dose of prazosin in the morning to combat Plaintiff's daytime panic attacks. (R. 337.)

Plaintiff visited Dr. Baldes for psychotherapy sessions on an irregular basis going forward. The record reflects ten psychotherapy sessions with Dr. Baldes lasting twenty to forty-five minutes from May of 2018 until March of 2019. (R. 364, 368, 371, 374, 377, 381, 384, 390.) During all visits, Dr. Baldes observed that Plaintiff "remain[ed] severely symptomatic." (R. 364, 368, 371, 374, 377, 381, 388, 384, 390.) From June 2018 until December 2018, Plaintiff "ma[de] rare use of the diazepam, often fearing the side

8

effects." (R. 374, 384.)  He continued "to struggle with severe panicky anxiety during the day . . . most times he trie[d] to leave the home." (R. 390.)  Dr. Baldes noted Plaintiff had suicidal thoughts and an intense, labile mood for meetings on and after December 19, 2018.  (R. 364, 368, 371.)

On September 20, 2018, Dr. Baldes completed a mental medical source statement for use in Plaintiff's case before the SSA.  (R. 357-62.)  He noted Plaintiff's current diagnoses of PTSD, obsessive-compulsive disorder, and panic disorder with agoraphobia, as well as Plaintiff's medications.  (R. 357.)  Plaintiff's symptoms included mood disturbances, emotional liability, recurrent panic attacks, obsessions or compulsions, social withdrawal, intrusive recollections of a traumatic experience, hostility and irritability, and difficulty thinking or concentrating. (R. 358.)  Dr. Baldes completed a "check the box" form regarding functional limitations.  He reported mild limitation[14] on following one- or two-step oral instructions to carry out a task. (R. 359.)  He reported marked limitations[15] in the following areas: sequencing multi-step activities, cooperating with others, asking for help when needed, initiating or sustaining conversation, working at an appropriate and consistent pace, changing activities or work settings without being disruptive, responding to demands, and adapting to changes.  (R. 359-60.)  He opined

---

[14] A mild limitation means a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.b.

[15] A marked limitation means a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.d.

9

Plaintiff had extreme limitations[16] in handling conflicts with others; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; working close to or with others without interrupting or distracting them; sustaining an ordinary and regular attendance at work; working a full day without needing more than the allotted number or length of rest periods during the day, and managing psychologically-based symptoms. (R. 359-60.)  For all other categories, he opined Plaintiff was moderately limited.[17]  (*Id.*)  Dr. Baldes checked the box indicating Plaintiff had a "medically documented history of a mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" as well as the box for "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands in the environment would be predicted to cause the individual to decompensate." (R. 360.)  Dr. Baldes also marked boxes indicating that Plaintiff's mental impairments would cause him to be late or absent from work more than four days each month and that he would be off task more 25% or more of the time.  (*Id.*)

### C. Hearing Testimony

At the hearing on September 10, 2018, Plaintiff testified that he completed the

---

[16] An extreme limitation means a claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.e.

[17] A moderate limitation means a claimant's functioning "in this area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2.c.

ninth grade but received his GED later. (R. 30.) He lives with his mother. (R. 31.)
Although Plaintiff has a driver's license, he only drives in emergencies because of his
"episodes." (*Id.*) He last worked at a Wendy's in 2010. (*Id.*) He testified he does not
look for work any longer because leaving the home is difficult for him and that re-
occurring and intrusive thoughts cause him to feel paralyzed. (R. 31-32.) He had tried to
find work "long, long ago" when his condition "wasn't as extreme" but it doesn't seem to
be something that he can do now even though he wants to and wishes he could. (R. 32.)

Plaintiff testified he met with Dr. Baldes "every two weeks" and takes medications
Dr. Baldes prescribed—prazosin and diazepam. (R. 32-33.) Plaintiff stated he takes
diazepam when an episode of anxiety gets "out of control," which could be two to three
times a month or two to three times a week. (R. 38.) Episodes are often triggered by
loud noises or bright lights. (R. 40.) Plaintiff testified that Dr. Baldes instructed him not
to try to do normal activities after taking diazepam because he could be a danger to
himself or others. (R. 39.)

When questioned about how he spent his days, Plaintiff testified he spends most of
his time trying to understand his own thoughts and trying to avoid thinking about
intrusive things. (R. 36.) He keeps himself occupied by reading ancient texts, listening
to mantras and relaxing sounds on YouTube, visiting with friends that stop by, watching
television, working out, pacing back and forth, and trying to do "every day normal things
[until] it just becomes impossible at some point or [he reaches] a breaking point. (*Id.*)
He likes to read and write. (R. 37.) His mother does the cooking, cleaning, and laundry
and "pretty much takes care of [him]," although he can do the laundry and cook a meal

for himself if he has to.  (*Id.*)  He usually makes his appointments, although sometimes he misses them if he has a hard time leaving the house.  (R. 37-38.)  He is able to take care of his personal needs like showering, cleaning up after himself, and dressing himself.  (R. 39.)

Vocational expert Warren Haagenson testified that a hypothetical individual of Plaintiff's age, education, work experience, and limitations[18] could not perform Plaintiff's past work as a fast-food worker, but could work as a small parts assembler, collator operator, or hand packager.  (R. 43.)  When Plaintiff's attorney added a limitation that the individual would be late or absent for work more than four days a month, Haagenson testified that the person would not be able to work.  (R. 44.)  When Plaintiff's attorney added an alternative limitation that the individual would be off task 25% or more of the time, Haagenson responded that such a limitation would rule out all competitive employment. (*Id.*)

### D.    The ALJ's Decision

The ALJ issued an adverse decision on September 26, 2019, concluding that Plaintiff was not disabled between July 24, 2017, and the date of the decision.  (R. 19.)[19]

---

[18] The ALJ described the hypothetical individual as able to understand, remember and carry out short simple instructions; able to interact appropriately with coworkers and the general public on an occasional basis; able to respond appropriately to work pressures in a usual work setting; able to respond appropriately to changes in a routine work setting; and able to maintain attention and concentration for routine work for two-hour segments. (R. 42-43.)

[19] Although the alleged disability onset date was June 1, 2007, the ALJ noted that supplemental security income is not payable prior to the month following the month in which the application was filed.  (R. 10, citing 20 C.F.R. § 416.335.)

In arriving at this decision, the ALJ utilized the five-step sequential analysis described in 20 C.F.R. § 416.920(a)(4).[20]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 24, 2017.  (R. 12.)  At step two, the ALJ found that Plaintiff had the following severe impairments: post-traumatic stress disorder, anxiety, depression, and borderline personality disorder.  (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id.*)  The ALJ specifically considered whether Plaintiff's mental impairments met or medically equaled the criteria of listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.15 (trauma-and stressor-related disorders).  (*Id.*)  However, she found that Plaintiff did not meet the Paragraph B criteria of those listings because he was not limited to an extreme degree in 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; or 4) adapting or managing oneself.  (R. 13-14.)  Nor was Plaintiff limited to a marked degree in two of those areas.  (*Id.*)  Instead, the ALJ determined Plaintiff had a moderate limitation in each of the four areas.  (*Id.*) The ALJ also found that Plaintiff did not meet the Paragraph C criteria because "there is

---

[20] The five steps are (1) whether the claimant's work activity was substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(i)–(v).

no evidence of marginal adjustment, defined as the minimal capacity to adapt to changes

in the claimant's environment or to demands not already part of his daily life." (R. 14.)

Between steps three and four, an ALJ must determine the claimant's residual

functional capacity ("RFC").[21] 20 C.F.R. § 416.920(e). Here, the ALJ found that

Plaintiff could perform a full range of work at all exertional levels, but with the following

nonexertional limitations:

> The claimant is able to understand, remember and carry out short, simple
> instructions. The claimant is able to interact appropriately with coworkers
> and the general public on an occasional basis. The claimant is able to
> respond appropriately to work pressures in a usual work setting. The
> claimant is able to respond appropriately to changes in a routine work
> setting. The claimant is able to maintain attention and concentration for
> routine work for two-hour segments.

(R. 14-15.) In making this assessment, the ALJ found that although Plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged symptoms,

Plaintiff's self-report regarding the intensity, persistence, and limiting effects of his

symptoms was inconsistent with the objective and subjective medical evidence and with

other relevant evidence of record. (R. 15.) In particular, the ALJ described and relied on

records documenting his non-use of medication between 1996 and 2017, lack of

psychological hospitalizations or crisis admissions, and history of better-than-alleged

functioning. (R. 16.) Specifically, Plaintiff's memory was described as intact, his

demeanor pleasant and cooperative, and attention adequate. (*Id.*) The ALJ also noted

---

[21] The RFC assessment is "based on all the relevant medical and other evidence in" the
record. 20 C.F.R. § 416.920(e). A claimant's RFC "is the most [he] can still do despite
[his] limitations." 20 C.F.R. § 416.945(a)(1).

that Plaintiff's prior incarceration could be an impediment to employment, which would not amount to a disability.  (*Id.*)  The ALJ placed great weight on the opinions of the disability determination service consultants, little weight on the opinion of consultative examiner Dr. Marcus Desmonde, and little weight on the opinion of Plaintiff's treating psychiatrist Dr. David Baldes.  (R. 17.)  The ALJ explained the reasons underlying the weight given each opinion.  (R. 16-18.)

At step four, the ALJ determined that Plaintiff could not perform his past relevant work as a fast food worker or telemarketer.[22]  (R. 18.)  The ALJ thus proceeded to step five of the sequential evaluation.  The ALJ determined Plaintiff's nonexertional limitations eroded the occupational base of unskilled work at all exertional levels.  (R. 19.)  However, based on the vocational expert's testimony, the ALJ determined Plaintiff could make a successful adjustment to other widely available jobs such as small parts assembler, collator operator, and hand packager-polypacker.  (R. 18-19.)  Accordingly, Plaintiff was found not disabled.  (R. 19.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).  Substantial evidence means "such relevant evidence as a

---

[22] The term "past relevant work" means "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 416.960(b)(1).

15

reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Dickinson v.* Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).).  This standard requires a court to consider not only evidence that supports the ALJ's decision but also evidence that detracts from it.  *See Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  The Court may not, however, reverse the ALJ's decision simply because "the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings," the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).  Put another way, "[t]he agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Nasrallah v. Barr,* 140 S. Ct. 1683, 1692 (2020) (describing the substantial evidence standard in the context of an immigration case).

## III.    Discussion

Plaintiff argues the ALJ's determination is not supported by substantial evidence for three reasons.  Two of his arguments concern the ALJ's analysis at step three. (Pl.'s Mem. Supp. Mot. Summ. J. at 9-13 [ECF No. 18].)  First, he argues the ALJ failed to consider the opinion of his treating physician, Dr. David Baldes, in concluding that Plaintiff's condition did not meet or equal the paragraph B or paragraph C criteria of the mental health impairment listings.  Second, he argues the ALJ did not take into account Plaintiff's support systems in considering whether he met the paragraph B or C criteria.

16

Finally, he argues the ALJ erroneously found only minimal nonexertional limitations with respect to his RFC despite Dr. Baldes's opinion supporting greater limitations, particularly with respect to absenteeism and off-task time.  (*Id.* at 13-15.)

### A. Whether the ALJ's Determination That Plaintiff's Impairments Do Not Meet or Equal a Listed Impairment Is Supported by Substantial Evidence

The claimant bears the burden of proving disability.  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  To establish that an impairment or combination of impairments meets or equals a listing, a claimant must establish all of the listing's specified criteria. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).  If an impairment manifests only some of these criteria, no matter how severe, it does not qualify as a listed impairment.  *Id.*

Plaintiff argues that because of his alleged mental impairments, he meets the listing criteria for any or all of 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.15 (trauma-and stressor-related disorders).  In order to establish that he met listing 12.08, he would have to establish the criteria set out in both paragraphs A and B; to establish that he met listings 12.04, 12.06, or 12.15, he would have to establish the criteria set out in either both paragraphs A and B or the requirements of both paragraphs A and C.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.A.2. The dispute raised by this appeal involves the criteria of paragraphs B and C.

Paragraph B of each listing provides the functional criteria to evaluate how mental impairments limit the claimant's mental functioning.  To satisfy the paragraph B criteria,

the claimant's mental impairment must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00.A.2.b., 12.00.E., F.

Paragraph C provides the criteria used to evaluate "serious and persistent mental disorders."  To satisfy the paragraph C criteria, the claimant's mental impairment must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00.A.2.c., 12.00.G.  The criterion in C1 is satisfied when the evidence shows that the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of the claimant's mental disorder.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.G.2.b.  The criterion in C2 is satisfied when the evidence shows that, despite the claimant's diminished symptoms and signs, the claimant has achieved only marginal adjustment, meaning his "adaptation to the requirements of daily life is fragile; that is, [he has] minimal capacity to adapt to changes in [his] environment or demands that are not already part of [his] daily life."  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.G.2.c.

### 1.    Whether the ALJ Failed to Consider Dr. Baldes's Opinions at Step Three

The first error alleged by Plaintiff is that the ALJ failed to consider Dr. Baldes's

opinions that supported a finding of at least marked limitations in each area of mental functioning at step three. Plaintiff argues that by failing to mention and give controlling weight to the opinions of Dr. Baldes at step three (and by giving greater weight to the state agency medical consultants and consultative psychologist), the ALJ committed clear error. (Pl.'s Mem. at 10.) Plaintiff relies on 20 C.F.R. § 404.1527(c)(2), and cites *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015) for the proposition that "a treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."

The Court disagrees, for several reasons. First, Plaintiff misconstrues the ALJ's decision. At step three, the ALJ cited the records reflecting the opinions and observations of Dr. Baldes, even if the ALJ did not refer to him by name. (*See* R. 13-14 (citing exhibits 13F/2-3 (Baldes 12/9/17 records), 16F/7 (Baldes 5/9/18 records), 19F/3 (Baldes 3/18/19 records), 20F/1-2 (Baldes 2/4/19 records) and 20F/8 (Baldes 12/03/18 records)).) More importantly, in the portion of her determination describing her RFC analysis (R. 14-17), the ALJ incorporates by reference her paragraph B discussion, explicitly recounts Dr. Baldes's opinions of Plaintiff's limitations (R. 17), and then explains why she did not find them persuasive:

> These opinions are generally out of proportion with the medical evidence record and are unpersuasive. As noted above, although the claimant has these impairments, the medical evidence records does not support a finding of disability. In 2017, it was noted that the claimant had not taken any medications since 1996 (Ex. 14F/2). Although the undersigned notes that the claimant states that he has

medication sensitivity, lack of medications over the course of his treatment suggests that the impairments are not as severe as alleged. Furthermore, although the claimant has been subsequently prescribed certain medications (which he testified to at his hearing), and has engaged in therapy services, there is no evidence of psychological hospitalizations or crisis admissions. Moreover, the "paragraph b" discussion above evidences that the claimant has no more than moderate limitations. In fact, there are many instances, which demonstrate better functioning than the claimant alleges. As noted above, the claimant's memory was intact on testing and examinations (Ex. 8F, 16F/7, 19F/3, 20F/2). Further the claimant has been described as pleasant and cooperative in the record (Ex. 11F/6, 13F/2, 19F/3, 20F/2). Additionally, his attention and concentration were adequate on multiple occasions in the record (Ex. 13F/3, 19F/3). Moreover, the consultative examiner found that the claimant showed good insight into problem areas for him and is taking medicine for his anxiety (Ex. 8F).

(R. 17-18.) Thus, contrary to Plaintiff's argument, the ALJ's determination, taken as a whole, clearly shows the ALJ took Dr. Baldes's opinions into account in connection with her paragraph B analysis at step three.

Second, Plaintiff relies on the incorrect standards for determining the weight to be given medical opinions. The regulation at 20 C.F.R. § 404.1527(c)(2) applies to disability insurance benefits claims filed before March 27, 2017, and is inapplicable in this context. Relatedly, *Miller* discussed the treating-physician rule, which the SSA substantively abolished for SSI claims filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c (2017). Previously, opinions from medical sources with a longstanding treatment relationship could be deemed controlling evidence. *See Mark E. v. Kijakazi*, Case No. 20-cv-2047, 2021 WL 6066260, at *5 (D. Minn. Dec. 7, 2021) (discussing substantively similar changes to 20 C.F.R. § 416.1520(c)). For claims filed on or after March 27, 2017, however, all medical opinions are evaluated using five factors: supportability; consistency; relationship with the claimant; specialization, and any other

relevant factors.  20 C.F.R. § 416.920c(c)(1) – (5) (2017).  The two most important

factors are supportability and consistency, which the ALJ must address explicitly.  20

C.F.R. § 416.920c(b)(2) (2017).  When the medical source provides multiple opinions,

the ALJ may analyze the findings from that source together in a single analysis and is not

required to articulate how he or she considered each finding individually.  20 C.F.R. §

416.920c(b)(1) (2017).

    Here, the ALJ discounted Dr. Baldes's opinions because she found them

unsupported by and out of proportion to the medical evidence of record.  (R. 17.)  *Cf.*

*Milam v. Covlin*, 794 F.3d 978, 983 (8th Cir. 2015) (upholding a similar conclusion under

the old treating-physician rule).  She noted that although Plaintiff stated he had a

sensitivity to medication, "lack of medications over the course of his treatment suggests

that the impairments are not as severe as alleged."  (*Id.*)[23]  She also pointed out the lack

of psychological hospitalizations or crisis admissions, and better-than-alleged functioning

during testing and examinations (including Dr. Baldes's own examinations),

demonstrating intact memory, adequate attention and concentration, good insight and

---

[23] The ALJ's apparent adoption of Dr. Baldes's statement that Plaintiff had taken *no*
medications from 1996 to 2017 (R. 16, citing Ex. 14F/2 (R. 333)) causes some concern,
as it ignores the evidence in the record, including in Dr. Baldes's own notes, that Plaintiff
had been prescribed at least one and perhaps as many as six or more medications during
the time he was incarcerated. (*See* R. 261, 329.)  However, Plaintiff did not testify on this
subject at the hearing, nor did he introduce prison records that might have spoken
definitively to his medication history during that time. (R. 29.)  Furthermore, the relevant
time period for the purpose of the disability determination was July 2017 to the date of
the determination, and the ALJ correctly recounted his medications during that period.  In
fact, even his current medication regimen could be characterized as relatively minimal in
contrast with the severity of symptoms alleged, with only a single anti-anxiety
medication taken regularly and another taken only in emergencies.

judgment, and a pleasant and cooperative demeanor in his interactions with his providers.
(R. 18.)  She also pointed to the fact that although Plaintiff described "angry outbursts"
and "throwing things," he was not violent toward people, has friends who stop by to
spend time with him, had stayed out of trouble in the past year, and is able to maintain
good hygiene and handle his own personal cares.  (R. 13, 14.)

Accordingly, the Court finds the ALJ properly analyzed the supportability,
consistency, and persuasiveness of Dr. Baldes's opinions as a whole under 20 C.F.R. §
416.920c(b)(1) and provided good reasons for giving little weight to his assessment of the
severity of Plaintiff's limitations. The Court also notes that Dr. Baldes's opinions on
Plaintiff's limitations were provided on a "check the box" form and the office notes upon
which those opinions were presumably based largely comprised Plaintiff's self-report of
his symptoms and responses rather than objective clinical evidence or evaluative testing
such as that done by Dr. Desmonde. The Eighth Circuit has observed that conclusory
opinions provided on such "check the box" forms may be discounted when unsupported
by objective testing or reasoned explanation.  *See Hogan v. Apfel,* 239 F.3rd 958, 961
(8th Cir. 2001); *Leckenby v. Astrue,* 487 F.3d 626, 632 (8th Cir. 2007);; *Grindley v.
Kijakazi,* 9 F.4th 622, 632 (8th Cir. 2021) (the ALJ can give limited weight to a treating
physician's check-box form where the form contained only conclusory statements and no
supporting analysis or explanation).

The record is somewhat less clear with regard to the paragraph C analysis, as the
ALJ discusses paragraph C in only a couple of sentences—finding "no evidence of
marginal adjustment, defined as the minimal capacity to adapt to changes in the

22

claimant's environment or to demands not already part of his daily life" (R. 14)—and does not cite Dr. Baldes's opinion to the contrary. (R. 360 (checking the box indicating that Plaintiff suffers from "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands in the environment would be predicted to cause the individual to decompensate").)  However, if the ALJ considers a medical source opinion overall and concludes for good reason that it is not entitled to weight, she need not mention and dissect each specific opinion.  20 C.F.R. § 416.920c(b)(1).  Moreover, the ALJ's failure to elaborate on her conclusion about paragraph C criteria is not reversible error where the conclusion is supported by her earlier discussion of Dr. Baldes's opinion overall. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (holding that the ALJ does not need to discuss every piece of evidence submitted and that the failure to cite to specific evidence does not indicate that such evidence was not considered); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) (holding that a failure to elaborate on a conclusion is not reversible error where the record supports the conclusion); *Vance v. Berryhill*, 860 F.3d 1114, 1117–18 (8th Cir. 2017) (holding ALJ's findings at step four cured lack of elaboration at step three).

The Court also finds the ALJ did not give undue weight to the state agency medical consultants and the consultative examiner in concluding Plaintiff did not meet the listing criteria.  Indeed, the ALJ concluded that they had *underevaluated* Plaintiff's limitations in certain areas, and consequently she incorporated greater limitations into her RFC in those areas. (R. 17.)  *See Pierce v. Kijakazi*, --- F.4th ---, ---, 2022 WL 38473, at *3 (8th Cir. Jan. 5, 2022) (holding that the ALJ did not err by considering two opinions,

23

determining claimant's RFC was somewhere in the middle, and giving good reasons for the decision).

### 2. Whether the ALJ Erred in Failing to Consider Plaintiff's Support Systems

Plaintiff next argues the ALJ erred in failing to consider his support systems at step three when evaluating his limitations in connection with the paragraph B and C criteria. (Pl.'s Mem. at 12-13.) Plaintiff points out that he spent nearly twenty years in prison,[24] which was a highly structured environment, and that since his release he has lived with his mother, who has performed nearly all household tasks. (R. 37.) Plaintiff argues the ALJ failed to consider what role these structured and/or supportive settings played in reducing the demands on him, thereby attenuating his symptoms and allowing him to function to a greater degree than he could on his own in the workplace.

The Commissioner responds first that Plaintiff's incarceration, whether or not it was structured, should not be considered because it was before the relevant time period and the regulations prohibit payment of disability benefits to imprisoned felons. (Def.'s Mem. Supp. Mot. Summ. J at 15 [ECF No. 23].) This argument misses the point. Plaintiff is not seeking benefits for that period, but that does not necessarily mean his mental health history during that period should not be considered in assessing his current claims of disability.

Second, the Commissioner argues that Plaintiff's current living situation does not

---

[24] Plaintiff spent ten years in prison immediately prior to his release in August 2016. (R. 260; *but see* R. 289 (claiming eighteen years).) Prior to his most recent incarceration, he spent time in various juvenile facilities, treatment centers, and foster homes. (R. 246.)

amount to a structured setting for purposes of the first paragraph C criterion. (Def.'s Mem. at 14-15.) Again, the Commissioner misses the point. Plaintiff's argument does not focus on the first criterion of paragraph C, and in any event the ALJ did not find that criterion had not been met; rather, the ALJ's brief discussion of paragraph C stated only that she found the *second* criterion had not been met. Plaintiff's argument is that the ALJ should have taken the structured setting of prison and the supportive environment in which he is currently living into account in connection with both the paragraph B limitations and the second paragraph C criterion. Contrary to the Commissioner's arguments, neither inquiry is limited to whether Plaintiff lived in a structured setting.

Section 12.00.D of 20 C.F.R. part 404, subpart P, appendix 1 requires the ALJ to consider claimant's psychosocial supports, structured setting, and living arrangements in assessing the claimant's mental functioning:

> Psychosocial supports, structured settings, and living arrangements, including assistance from family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce the symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.D.1. Among the examples of supports identified in the regulation is "help from family members or other people who monitor your daily activities and help you to function, [such as] family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone." *Id.* at subpar. 1.a; *see also* 20 C.F.R. pt. 404, subpt.

P, app. 1, § 12.00.D.3.   As the Eighth Circuit noted in *Nowling v. Colvin,* 813 F.3d 1110, 1122 (8th Cir. 2016), "participation in activities with family or activities at home and at "your own pace" may not reflect an ability to perform at work."  The regulations also specifically call out consideration of the "kind and extent of supports or supervision you receive . . . which enable you to function" in rating limitations of areas of mental functioning under paragraph B.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.3.e.  "The more extensive the support you need from others or the more structured the setting you need in order to function, the more limited we will find you to be." *Id.*  Plaintiff argues the ALJ failed to consider Plaintiff's supports as required by these regulations when she evaluated the degree to which Plaintiff's impairments limit his functioning.

The Court finds no error in the ALJ's failure to discuss the structured environment in which Plaintiff lived during his incarceration.  Plaintiff's counsel himself opted not to introduce any of the prison records into the record, stating they were largely if not entirely irrelevant to the disability determination. (R. 29.)  Thus, there is no record upon which the ALJ could have evaluated the effect of that setting on Plaintiff's medications, symptoms, or limitations, even if she had thought it relevant to do so.

The ALJ's consideration of Plaintiff's *current* living situation, in particular the support he receives from his mother and Plaintiff's own efforts to isolate himself at home, presents a closer call.   However, after careful review of the record, the Court concludes that although the ALJ did not explicitly mention the regulation's requirement to consider the effects of a claimant's support systems and living arrangements, she took Plaintiff's supports and living arrangements into account in her decision to the extent

26

warranted by the evidence.

First, the Court notes that in describing Plaintiff's daily activities, the ALJ did not overstate Plaintiff's own activities nor attribute activities to Plaintiff that he testified were performed by his mother.  Second, while the record reflects that Plaintiff's mother takes care of the household chores, there was no testimony or other evidence of record indicating that she plays a structuring or protective role in helping him manage his symptoms, that she has assisted in keeping him out of trouble, or that she manages or facilitates his interactions with others, including the friends who stop by to visit.  Nothing in the record suggests that she "monitor[s] [his] daily activities and help[s] [him] to function, . . . administer[s] [his] medications, remind[s] [him] to eat, shop[s] for [him] and pay[s] [his] bills, or change[s] [her] work hours so [he is] never home alone" as described in 20 C.F.R. part 404, subpart P, appendix 1, § 12.00.D.1.a.  There was no testimony she makes his medical appointments, and the medical records reflect that she has not accompanied him to those appointments, including to his evaluation by Dr. Desmonde (R. 294 ("[claimant] came alone")) and his appointments with Dr. Baldes. (*see, e.g.*, R. 364-67 (no mention of any person with Plaintiff)).  In addition, the ALJ specifically considered the record evidence, including Plaintiff's testimony, that it is difficult for him to leave home and that he "will often result [sic] to secluding himself in his home" (R. 15).

By contrast, in *Nowling,* relied upon by Plaintiff, the ALJ mistakenly characterized the plaintiff as able to shop by herself, and wholly failed to take into account testimony by a family member that she did not go anywhere in public without a family member to

accompany her. 813 F.3d at 1121. Among other errors warranting remand, the appellate court found the failure to consider that testimony and the misstatement of the evidence demonstrated a failure to analyze the effects of a structured setting as required by the regulations.[25]

Here, the Court cannot conclude that the ALJ failed to consider "the complete picture of [Plaintiff's] daily functioning, including the extent, and frequency of help and support [he] receive[d]," when evaluating "whether [Plaintiff is] able to use the four areas of mental functioning in a work setting" as required by 20 C.F.R. part 404, subpart P, appendix 1, § 12.00.D.3 (2017). It is not for the Court to reweigh the evidence or to substitute its view for those of the ALJ merely because it might have drawn different conclusions from the evidence, so long as there is enough evidence that a reasonable mind might accept as adequate to support the Commissioner's conclusion.

In sum, the Court concludes the ALJ did not err at step three and that her findings were supported by substantial evidence.

**B.      Whether the ALJ Erred in Concluding Plaintiff had an RFC to Perform Work with Only Minimal Nonexertional Limitations**

The RFC assessment is "based on all the relevant medical and other evidence" in

---

[25] The *Nowling* court relied, in part, on an earlier version of 20 C.F.R. pt. 404, subpt. P, app. 1, § 1200.F, which provided that "[i]f your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings." 813 F.3d at 1121 n.8. Nevertheless, while the regulations no longer contain this particular language, other portions of § 12.00.D and § 12.00.F make it clear that the effects of supportive or structured settings must be taken into account to determine whether a claimant's life activities "actually speak to a claimant's ability to hold a job." *Nowling,* 813 F.3d at 1122.

the record.  20 C.F.R. § 416.920(e).  The claimant's RFC must be supported by some medical evidence.  *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam).  That medical evidence should address the claimant's ability to function in the workplace.  *See Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003).  The RFC must include those impairments which are substantially supported by the record as a whole.  *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).

Plaintiff faults the ALJ for attributing only minimal nonexertional limitations on Plaintiff's RFC, but his argument relies entirely on the ALJ's failure to give controlling weight to the opinion of Dr. Baldes.  That argument is rejected again for the reasons stated above.  While the ALJ may not have explicitly mentioned Dr. Baldes's opinion that Plaintiff would be absent from work more than four days a month and off task 25% or more of the time (R. 361), the ALJ gave good reasons for deciding not to give weight to Dr. Baldes's opinions overall.  As already noted, the ALJ is not required to rearticulate her reasoning in each section, nor discuss every piece of evidence submitted. *See Black*, 143 F.3d at 386;  *Scott*, 529 F.3d at 822.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [ECF No. 17] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [ECF No. 22] be **GRANTED**; and

3.    Judgment be entered accordingly.

Dated: January 24, 2022

*/s Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).